Filed
File Date: 1/31/2021 4:15 PM
Rockingham Superior Court
E-Filed Document

## THE STATE OF NEW HAMPSHIRE

**ROCKINGHAM, SS.**                                    **SUPERIOR COURT**

| | |
|---|---|
| **AMBER SOUTHER, JESSICA JOHNSON, and REBECCA COOK,** | |
| **Plaintiff,** | |
| **v.** | **CIVIL ACTION NO. _____** 218-2021-CV-00106 |
| **MR. STAX, INC., SEABROOK PANCAKES, INC., CHARLES MONISINOS, OLIVER PEREZ, MARIA WREN, and HAROLD CERON,** | |
| **Defendants.** | |

## COMPLAINT AND JURY DEMAND

## INTRODUCTION

1.       Plaintiffs Amber Souther ("Souther"), Jessica Johnson ("Johnson"), and Rebecca Cook ("Cook") (collectively referred to as "Plaintiffs") bring claims against their former employers Mr. Stax, Inc. and Seabrook Pancakes, Inc., which together owned and operated an iHOP restaurant franchise located in Seabrook, New Hampshire (collectively referred to as "iHOP"). Plaintiffs also bring claims against four individuals, Charles Monisinos ("Monisinos"), Oliver Perez ("Perez"), Maria Wren ("Wren"), and Harold Ceron ("Ceron") (iHOP and the four individuals are collectively referred to as "Defendants"). Plaintiffs assert claims for disparate treatment discrimination and harassment (hostile work environment) both based on their gender (female) and their national origin (American) in violation of N.H. R.S.A. 354-A:6 & 7 and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e(as to national origin only); and unlawful retaliation in violation of N.H. R.S.A. 354-A:19, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e 3(a) (the bases of Plaintiffs' claims are referred to collectively herein as their

"Protected Categories").

2.      iHOP completely failed to ensure a welcoming workplace for all employees that is free of disparate treatment based upon gender and national origin. iHOP also failed to prevent the sexually charged and offensive hostile work environment to which the American female employees were subjected, and similarly failed to prevent retaliation after Plaintiffs complained.

3.      Through its failures, iHOP enabled Monisinos to foster a hostile and overtly sexually charged work environment where Perez was free to date, kiss, fondle/grope his subordinates in the restaurant, including two young girls (a 17-year-old kitchen employee and a 17-year-old hostess), the male members of the kitchen staff, including Perez (hereinafter collectively referred to as the "Kitchen Staff") were free to make gender-based offensive slurs towards the female servers, and then to retaliate against the Cook, Johnson, Souther for complaining with no fear of repercussion. Souther was also unlawfully terminated in retaliation for making legitimate complaints and both Johnson and Cook were constructively discharged because of the cumulative set of events and the severe impact on their mental health. iHOP also exhibited clear favoritism of the Guatemalan and/or Latino Kitchen Staff at the direct expense of American female servers.

4.      Following the Plaintiffs' numerous complaints to the company about iHOP's clear favoritism of the Kitchen Staff, Monisinos's nepotism, the sexually charged work environment, sexual harassment of the Plaintiffs and the rest of the American female waitstaff by the Kitchen Staff, and the Kitchen Staff's retaliation, iHOP terminated Souther and constructively discharged Cook and Johnson. Upon information and belief, the harassment of the female American waitstaff continues to be a rampant problem at iHOP's Seabrook location.

5.      Any woman who reported that they had issues with or were offended or adversely

impacted by iHOP's favoritism of Perez and the Kitchen Staff, the sexually charged work environment, or the abusive retaliatory conduct of the Kitchen Staff, were written-up by the company and/or treated worse by the Kitchen Staff. Even worse, two minor female victims of sexual harassment, which included offensive touching by Perez, exited the workplace under mysterious and suspicious circumstances that will certainly need to be the subject of evidence discovery.

6.      Plaintiffs made repeated attempts to resolve these issues through regional management, corporate Human Resources, and ultimately the Chief Operating Officer ("COO") which were never resolved.

7.      As a result of its actions and omissions, iHOP allowed Plaintiffs to be treated differently than the kitchen employees because of their gender and national origin, as well as nepotism. iHOP also subjected them to a hostile and sexually charged work environment, which included sexual harassment, and retaliated against them because of their complaints.

8.      At no time following either Souther, Johnson, or Cook's multiple attempts to seek resolution of these issues did iHOP take decisive action or institute any meaningful changes to alleviate the hostile, sexually charged, and offensive work environment that Plaintiffs experienced.

9.      As a result of iHOP's acts and omissions, Plaintiffs have suffered monetary damages and especially significant emotional distress.

## PARTIES

10.     Souther is a female individual residing at 11 Collins Street, Apt 36, Seabrook, NH 03874. Her national origin is American (white person of Anglo-Saxon descent). At all times relevant, Souther was a citizen of New Hampshire and worked out of iHOP's Seabrook, NH

location located at 570 Lafayette Rd., Seabrook, NH 03874.

11.     Johnson is a female individual residing at 104 Ledgewood Drive, #9, Portsmouth, NH 03801. Her national origin is American (white person of Eastern and Western European descent). At all times relevant, Johnson was a citizen of New Hampshire and worked out of iHOP's Seabrook, NH location located at 570 Lafayette Rd., Seabrook, NH 03874.

12.     Cook is a female individual residing at 698 Lafayette Road, Apt 122, Hampton, NH 03842. Her national origin is American (white person of Anglo-Saxon and Western European descent). At all times relevant, Cook was a citizen of New Hampshire and worked out of iHOP's Seabrook, NH location located at 570 Lafayette Rd., Seabrook, NH 03874.

13.     Upon information and belief, the iHOP restaurant located in Seabrook, New Hampshire is owned and operated by Seabrook Pancakes, Inc. ("Seabrook Pancakes"), a corporation organized under the laws of Nevada with its principal place of business located at 25060 Avenue, Stanford Suite 200, Valencia, CA 91355.

14.     Upon information and belief, Seabrook Pancakes is a subsidiary of Mr. Stax, Inc. ("Mr. Stax"), a corporation organized under the laws of Nevada with its principal place of business located at 25060 Avenue, Stanford Suite 200, Valencia, CA 91355. Mr. Stax's New Hampshire Address is 570 Lafayette Rd., Seabrook, NH 03874.

15.     Upon information and belief, Monisinos is an individual who resides in and is a citizen of Massachusetts. Monisinos's mailing address is c/o Mr. Stax, Inc., 25060 Avenue, Stanford Suite 200, Valencia, CA 91355. At all times relevant from January 2018-present, Monisinos was employed by Mr. Stax and was the District Manager of the iHOP Seabrook, New Hampshire location located at 570 Lafayette Rd., Seabrook, NH 03874. Monisinos is of Dominican national origin.

16.     Upon information and belief, Perez is an individual who resided in and is a citizen of Massachusetts. Perez's mailing address is 49 Johnson Street, #3, Lynn, MA 01902. At all times relevant until September 14, 2019, Perez was an employee of Mr. Stax working as the Kitchen Manager at iHOP at the Seabrook, New Hampshire location located at 570 Lafayette Rd., Seabrook, NH 03874. At all times relevant, Perez was a married man in his late 40s early 50s. Perez is of Guatemalan national origin.

17.     Upon information and belief, Wren is an individual who resides in and is a citizen of California. Wren's mailing address is c/o Mr. Stax, Inc., 25060 Avenue, Stanford Suite 200, Valencia, CA 91355. At all times relevant, Wren was employed by Mr. Stax and was the Executive Director of Human Resources at iHOP, whose job responsibilities included oversight of the Seabrook, New Hampshire restaurant.

18.     Upon information and belief, Ceron is an individual who resides in and is a citizen of Texas. Ceron's mailing address is c/o Mr. Stax, Inc., 25060 Avenue, Stanford Suite 200, Valencia, CA 91355. At all times relevant from early 2019-present, Ceron was employed by Mr. Stax and was the Chief Operating Officer ("COO") at iHOP, whose job responsibilities included oversight of the Seabrook, New Hampshire restaurant.

19.     At all times relevant, Plaintiffs were employees of Seabrook Pancakes. Plaintiffs were paid by Seabrook Pancakes which was reflected on their paychecks.

20.     Monisinos, Wren and Ceron are employees of Mr. Stax. As the facts below state in further detail, Monisinos, Wren, and Ceron, as agents of Mr. Stax were regularly involved in the day-to-day operations of the Seabrook iHOP. They regularly made decisions that impacted Plaintiffs' employment, including but not limiting to operations, discipline, hiring and firing. As a result, at all times relevant, Mr. Stax was Plaintiffs' employer, or at least their joint employer.

## JURISDICTION, VENUE, AND EXHAUSTION OF REMEDIES

21.     Jurisdiction is proper before this Court based on N.H. R.S.A. Ch. 491:7.

22.     Jurisdiction is also proper before this Court based on N.H. R.S.A. Ch. 510:4 (long-arm statute).

23.     Venue before this court is proper before this Court pursuant to N.H. R.S.A. Ch. 507:9 because iHOP conducts business in Rockingham County, all Plaintiffs worked in Rockingham County during the relevant period, and all individual Defendants conducted business during the relevant period in Rockingham County.

24.     Plaintiffs exhausted all their required administrative remedies:

   (a)  Plaintiffs filed charges of employment discrimination with the New Hampshire Commission of Human Rights ("NHCHR") and cross-filed their charges with the U.S. Equal Employment Opportunity Commission ("EEOC") on March 6, 2020 within 180 days of the commission of the unlawful employment practices alleged herein. The NHCHR investigated their claims.

   (b)  In the midst of the NHCHR investigation, Plaintiffs exercised their right to withdraw their charges on September 15, 2020. The NHCHR dismissed the charges and closed its files for all three Plaintiffs on September 23, 2020.

   (c)  On October 28, 2020, the EEOC closed its file on all three Plaintiffs' claims and issued right to sue letters. Plaintiffs received the EEOC right to sue letters on November 3, 2020.

## FACTS

## HOSTILE, SEXUALLY CHARGED WORK ENVIRONMENT, AND FAVORITISM OF PEREZ AND THE REST OF THE KITCHEN STAFF BY IHOP TO THE DETRIMENT OF PLAINTIFFS AND THE OTHER AMERICAN SERVERS

### Background Facts: Plaintiffs' Employment at iHOP

25.     Souther commenced working for iHOP in November 2014 at the iHOP Newington, New Hampshire location. Souther transferred from the iHOP Newington location to the iHOP Seabrook location in November 2016 as a Waitress. iHOP terminated Souther's employment on December 28, 2019.

26.     Johnson commenced working at iHOP Seabrook in July 2017 as the General Manager following training at the iHOP located in Salem, Massachusetts. Johnson resigned from her employment – as a constructive discharge – on February 21, 2020.

27.     Cook commenced working at iHOP's Seabrook location in August 2018 as a Waitress and a Person-in-Charge ("PIC").[1] Cook resigned from her employment – as a constructive discharge – on July 21, 2020.

### Perez Terminates and Replaces all White/American Men and Women in the Kitchen with Latino Employees

28.     In approximately late 2016, Perez fired all the white/American men and women in the kitchen, and during the hiring process to refill the jobs he told Souther would not hire any women or white people saying: "no women and no white people in my kitchen." Upon information and belief, the then-current General Manager John (l/n/u) ("John") agreed to terminate most of the kitchen employees upon Perez's suggestions. After this date, there were no

---

[1]     The PIC is the acting supervisor when the General Manager is not at the restaurant. The PIC has several responsibilities such as opening/closing the restaurant, handling guest complaints, making schedule adjustments, paying invoices, making deposits at the bank, supervising staff, etc. The PIC oversees everything except the payroll when the General Manager is not present.

more "white people" in his kitchen. While after this date there were no more "white women" in the kitchen however, there have been some younger women of Guatemalan national origin working in the kitchen -- most of whom Perez has dated.

29.     Perez oversaw hiring the new kitchen employees and that he chose to hire mostly family members and friends. The new kitchen employees were all from Guatemala and/or of Guatemalan national origin, except for one kitchen employee - Jose "Elfrist" Hererra ("Hererra") - whose national origin is Dominican. The primary language spoken by and between the kitchen employees was Spanish.

### Perez's Inappropriate Sexual Conduct with the Female Kitchen Employees and Perez and the Other Male Kitchen Employee's Inappropriate Conduct Directed Towards the White Servers

30.     Beginning at the end of 2016, the Kitchen Staff started calling Souther "puta" and "coño" which mean "whore" and "cunt" in Spanish. Souther reported this name calling to former District Manager Sanjog Rana ("Rana"). Upon information and belief, iHOP did not investigate Souther's complaint, nor did iHOP discipline any of the Kitchen Staff. The Kitchen Staff's behavior continued.

31.     Sometime after in early 2017, Souther began witnessing Perez frequently behaving in an inappropriate and sexual manner with the female American kitchen employees, including grabbing them in a playful manner, touching their buttocks, fondling them, and kissing them. Souther complained to Perez that it was "ethically and morally wrong" and "I don't want to see this."

32.     In March 2017, Souther reported Perez's inappropriate sexual behavior to then-current General Manager John, as well as to Rana. Upon information and belief, neither John nor Rana investigated Souther's complaint, nor did iHOP discipline Perez – Perez's behavior continued.

33.     Souther complained to John a few more times about the inappropriate sexual behavior and inappropriate name calling ("puta" and "coño") by the Kitchen Staff, but, upon information and belief, he never did anything to stop Perez's inappropriate behavior.

34.     In July 2017, Johnson started working as the new General Manager at iHOP Seabrook. For two weeks, Johnson shadowed John learning the job.

35.     In July 2017, during Johnson's first week at iHOP Seabrook, Johnson, Souther and other white female servers witnessed inappropriate behavior between Perez and a 17-year-old female cook. Souther witnessed Perez kissing and touching other Guatemalan female cooks including the 17-year-old female cook, while Johnson only witnessed Perez's inappropriate touching. Johnson and Souther mentioned what they witnessed to John who told them, "It's a battle you won't win." Johnson reported Perez's behavior with Rana who immediately dismissed her stating: "we just need to keep him happy" referring to Perez. Upon information and belief, iHOP wanted to "just … keep him happy" because Perez brought in all kitchen employees and "controlled the kitchen."

36.     Despite the complaints of Souther and Johnson, Perez's inappropriate sexual behavior continued unabated. Souther was routinely forced to witness his inappropriate behavior nearly every shift. Souther frequently told Perez, "I don't want to see this." Souther also complained to Johnson who made new reports of the continuing incidents to Rana – the reports fell on deaf ears and nothing was done by the company to stop the misconduct.

37.     In September 2017, Johnson suffered a Transient Ischemic Attack ("TIA") (a miniature stroke) that caused her to miss work. Johnson had (which continued throughout her employment and after her constructive discharge) been dealing with an unnecessary amount of stress related to iHOP's illegal activities. Johnson was born with a hole in her heart, her

condition can worsen with high levels of stress, such as the stress she had been experiencing at iHOP. Johnson returned two days later wearing a heart monitor which she was required to wear for 31 days.

38.     In approximately early January 2018, Monisinos who had previously worked at iHOP returned to iHOP[2] as the District Manager for the Seabrook location.[3] Monisinos is also Perez's cousin.[4] Shortly after Monisinos's return to iHOP, Souther noticed that the Kitchen Staff began calling her and other servers "puta" and "coño" even more frequently. She reported these incidents to Monisinos each time she saw Monisinos in the restaurant, approximately, once per month. Souther also reported this behavior to Johnson and Jennifer Sparks ("Sparks"), Field Human Resources Leader for the East Coast (Mr. Stax.). Additionally, Johnson routinely reported Souther's concern to Monisinos.

39.     While the Kitchen Staff initially began calling Souther "puta" and "coño" near the end of her first year at iHOP, this behavior began to worsen approximately around the time Monisinos returned to iHOP in January 2018.

40.     Following Monisinos's return, Perez's inappropriate behavior became more and more blatant. Souther began witnessing Perez and some female members of the kitchen staff "making out and grabbing asses" almost every shift she worked. Perez and Veronica Lopez ("Lopez"), a 19-year-old female who worked in the kitchen and with whom Perez's engaged in an adulterous relationship, were always together – driving in together, working side-by-side, "always hanging on each other," -- everywhere he went, she followed.

---

[2]     Monisinos left iHOP to work for another company for a brief period.

[3]     Upon information and belief, Rana was terminated following an investigation into sexual harassment allegations.

[4]     Upon information and belief, Monisinos may also be related to at least two other current members of the Kitchen Staff.

41.     When Johnson first started working at iHOP, she noticed that she did not have the I-9 documentation for several of the kitchen employees or the identifications she had appeared to be clearly fraudulent. It was clear to Johnson that a different person's head was attached sloppily to another person's body. Rana asked Johnson to forge the expiration date on Javier Perez ("Javier")'s[5] I-9 after it had expired. Johnson refused. Johnson reported this to Mr. Stax's Human Resources department (Johnson does not recall the name of the individual she spoke to there) by e-mail and suggested they "e-verify" I-9s. Johnson was told they do not "e-verify" and "we don't pay you to be an expert on IDs." For the first few months after Monisinos returned to iHOP, Johnson reported these fraudulent identifications to Monisinos. Monisinos repeated the same line: "That's not your job to verify. Do your job." Eventually, Johnson understood iHOP's clear message – don't question the kitchen employees' identifications or I-9s. Johnson was very fearful that her restaurant would be audited as she was aware that the Bedford iHOP had been audited by U.S. Immigrations and Customs Enforcement ("ICE") and a few workers were caught. The Bedford iHOP was severely reprimanded by ICE. Johnson was also told by a representative from Mr. Stax's Human Resources department that once Mr. Stax obtained the I-9 and identification document for a Seabrook employee hire, she was not supposed to retain a copy – Mr. Stax instructed her to shred them. Johnson questioned this practice but the Human Resources professional at Mr. Stax's Human Resources department demanded that she just do as she was told.

42.     After almost a year of witnessing Perez's inappropriate sexual conduct without any discipline by iHOP, Perez seemed as though he knew he was "untouchable" and his behavior only became more blatant and offensive. It was also well known at iHOP Seabrook that Perez

---

[5]     Javier is Perez's nephew and possibly Monisinos's relative as well.

was dating Lopez (a 19-year-old kitchen employee) against company policy, even though he was married to another woman. The situation was so absurd that at one point Johnson informed Monisinos that Lopez was pregnant and Monisinos responded by telling Johnson that she should tell Perez "Congrats."

**Johnson and Souther Report Perez's Sexual Misconduct with by 17-Year-Old Female Kitchen Employee and iHOP's Related Cover-Up**

43.     In addition to Perez's misconduct with respect to Lopez, the Complainants frequently observed him behaving inappropriately with a 17-year-old female kitchen employee. On April 27, 2018, Perez's behavior became so inappropriate and offensive that Souther and a few other servers reported his behavior to Johnson "because [they've] had enough of watching a grown man touch a 17-year-old girl"[6] and asked her to watch the surveillance videos, because they believed some of the surveillance cameras may have picked up some of Perez's inappropriate sexual conduct from the previous night.

44.     On April 27, 2018, after their complaint, Johnson immediately viewed several hours of surveillance tape and was able to observe Perez kissing the buttocks of a 17-year-old female kitchen staff employee. The video also showed the 17-year-old sitting on top of preparation counter, with Perez standing in front of her making a fist with his hands and bouncing them on her thighs. Perez also forced open her legs with his hands so that he could move his body closer to her. There was also another video of Perez kissing the 17-year-old girl.

45.     Immediately after viewing the surveillance videos, Johnson sent the videos to Monisinos and the then-current COO, Sal Moralis ("Moralis"), Ceron's predecessor, and told him that the entire staff had witnessed Perez's repeated inappropriate sexual conduct and

---

[6]     In addition to Lopez, Perez frequently engaged in inappropriate sexual conduct with a 17-year-old female kitchen employee.

"nothing ever changes" and "we all have had enough." Moralis and Monisinos told Johnson that they "had it under control" and they "dealt with it."

46.     Immediately following Johnson's complaint to Monisinos, the 17-year-old kitchen employee mysteriously never returned to work at the iHOP Seabrook location. Johnson was not included in any of the departure details and Monisinos did not inform her of the 17-year-old employee's employment status other than stating that she would not be returning. This was highly unusual as the General Manager is ordinarily involved in staffing changes. Upon information and belief, iHOP "took care of the problem" with Perez by terminating the 17-year-old kitchen employee or forcing her to quit. iHOP made the problem "go away" by removing the victim. Upon information and belief, iHOP never disciplined Perez for his inappropriate and illegal workplace conduct. Additionally, no one from Human Resources ever visited iHOP Seabrook to interview Souther or Johnson, nor did Human Resources ever speak to Johnson about the incident of sexual misconduct that she reported.

**Retaliation Against Souther for Frequently Reporting Perez's Misconduct**

47.     Starting in the Summer of 2018, iHOP Seabrook was low on staff and needed to hire another PIC. Instead, Monisinos had Souther work as a PIC but refused to pay her for her extra responsibilities. A PIC earns approximately $10 per hour more than a waitress, in addition to being eligible to earn tips. PICs oversee the waitstaff during the shift and have additional responsibilities such as making deposits at the bank and are given a key to the cash box.

48.     One day, in the ladies' bathroom, Souther noticed one of the young female servers "nodding out" and looking like she was under the influence of alcohol or drugs. Souther told her she had to go home and could not be at work like that. The girl immediately started flipping out and screaming on the floor. Souther sent the girl home and then reported what happened to

Johnson later that evening (Johnson was off that day). Later, the young woman's parents wrote a letter to an individual at Mr. Stax's corporate office, complaining that Souther was "rude and degrading" to their daughter. Monisinos wrote Amber up for this incident and suspended her for a week. Souther lost a week's worth of tips as a result. Monisinos also told Sparks in Human Resources that Souther "can't be PIC" and demoted her back to waitress. While Monisinos later admitted to Souther the write-up "wasn't warranted." Initially, Monisinos told Souther she could work as a PIC, but only on the weekends (thus significantly reducing her hours). Upon information and belief, the unwarranted write-up and the demotion with accompanying reduced pay were actually done in retaliation for Souther's prior reporting of Perez's sexual indiscretions.

49.     A few months later, one of the PICs left and Johnson needed someone who could work as a PIC on her days off (Tuesday and Wednesday). Johnson submitted a request for Souther to be a PIC, and it was neither denied or accepted, so Johnson paid her accordingly and had Souther work as a PIC on those days. Later, as explained below, Monisinos would take the PIC position away from Souther again.

### Cook Commenced Employment at iHOP and Began Witnessing the Same Misconduct from the Kitchen Staff

50.     In August 2018, after Cook first commenced her employment, she too observed Perez's sexually inappropriate conduct which had continued after the April complaints. Cook, upset, mentioned this misconduct to her fellow female American co-workers, including Souther, who told her: "This is how it is here. You can complain to upper management, but nothing ever changes." Souther also informed Cook about the several complaints made in April 2018 and the way the company mishandled them.

51.     Beginning in September 2018, Johnson had several conversations with Perez as well as Monisinos about Perez's continuing inappropriate sexual conduct and inappropriate

behavior with female employees. Every time Johnson reported Perez's behavior to Monisinos, he assured her that he'd "handle it." Upon information and belief, Monisinos never disciplined Perez and the misconduct did not stop.

52.     After a few months of working at iHOP, beginning in approximately October 2018, whenever Cook took a break and walked outside, one of the kitchen employees Jose Beletzuy ("Jose") (Jose is Perez's nephew and is likely also related to Monisinos) shouted at her "See you next Tuesday" while smiling wryly. Confused, Cook responded "You know I don't work Tuesday." Jose laughed. After Jose said this to her a few more times, Cook realized he was saying "CU Next Tuesday" or "C.U.N.T."

53.     In around December 2018, Cook noticed that the Kitchen Staff routinely called the waitresses, including herself, names in Spanish like "puta" and "coño." At first, Cook did not know what those words meant, so she asked her son to help her use Google to translate them. She learned the words meant "whore" and "cunt" in Spanish. Cook was embarrassed she had her son look them up online.

54.     Cook complained to Perez nearly every day about the offensive conduct of the Kitchen Staff. Perez told Cook nonchalantly, "Oh, that's not good." The offensive conduct continued, and upon information and belief, Perez never took any steps to stop it. Also, beginning in January 2019, once per month when Monisinos visited the iHOP Seabrook, Cook reported to him that the Kitchen Staff called her and the other white female servers "cunt" and "whore" in Spanish, as well as inappropriate way the Kitchen Staff spoke to them. Frequently, when Cook complained to Monisinos, the Kitchen Staff inappropriately called her names while he was in the restaurant. Cook hoped that Perez or Monisinos, who both spoke Spanish and English, would speak to the Kitchen Staff about calling the white female servers names. Upon

information and belief, Monisinos never investigated her complaints, nor did he discipline the

Kitchen Staff. The sexually harassing language and name calling continued.

55.     Further, the Kitchen Staff's behavior worsened and became even more blatant

following any complaints Souther, Cook and Johnson made about either the Kitchen Staff's or

Perez's inappropriate behavior to Monisinos. The Kitchen Staff's offensive name calling to

Cook, Souther, and the other white female servers only became more frequent. In contrast,

Souther and Cook constantly overheard the Kitchen Staff calling the Guatemalan women who

work in the kitchen "bella" and overheard them saying "ciao bella" when the female Guatemalan

kitchen workers left after their shift. Additionally, any time Johnson asked Jose for something he

would respond "Yes, mi amore." No matter how many times Johnson reported their behavior to

Monisinos, he ignored it and nothing was done to stop it.

### Johnson files a Sexual Harassment Report on behalf of a
### 17-Year-Old Hostess Against Perez and iHOP's Related Cover-Up

56.     In March 2019, a 17-year-old hostess came to Souther and another server

hysterically crying saying that Perez made sexual advances towards her, including hugging her,

telling her to "come hug me honey you're so beautiful" and "you're so pretty," and generally

making her feel terribly uncomfortable. Souther brought the 17-year-old hostess to Johnson to

report the incident. Johnson first called Monisinos to tell him what happened. Then, upon

Johnson's direction, the 17-year-old hostess wrote a statement to report the incident. Johnson

submitted the written statement to Monisinos. Upon information and belief, Monisinos never

disciplined Perez for his behavior. Cook asked Johnson if there was anything further they could

do. Johnson told her, communicating what had been told to her previously, that because of the

language barrier with Kitchen Staff, Monisinos was responsible for handling all "back of the

house issues" (the back part of the restaurant, away from the customers). Because all the Kitchen

Staff spoke very little or no English, Johnson was forced to rely on Monisinos to handle their discipline; however, upon information and belief Monisinos did not discipline the Kitchen Staff and condoned their misbehavior. And even if iHOP did implement any remedial measures, the misbehavior did not stop.

57.     Following this incident, the 17-year-old gave her two weeks' notice. Once again, the victim left the iHOP Seabrook hostile environment and Perez and his staff remained. The Kitchen Staff's inappropriate sexual behavior continued unabated.

58.     Upon information and belief, Monisinos never gave Human Resources, or anyone else, a copy of the 17-year-old hostess's written statement regarding her sexual harassment claim against Perez.

59.     Whenever Johnson attempted to discipline Perez, he retaliated against Johnson and the servers by manipulating how long it took to make the food. The Kitchen Staff treated Perez as though he was in charge calling him "boss," while Johnson was always "Jessica."

**Monisinos Retaliates Further Against Souther**

60.     In early September 2019, a few waitresses quit and complained that they quit because of Souther and called her a "bully." On September 3, 2019, Monisinos and Sparks arrived at the restaurant, on Johnson's day off. Sparks and Monisinos arrived before Souther. When Souther arrived at the restaurant she came through the back door and saw Jose (one of the cooks, Perez's nephew, and possibly Monisinos's relative) and Elizabeth Niz ("Niz"), one of the combos ("combo" clear tables, clean bathrooms, dishwasher and prepare food), kissing. One of the other servers Dawn Mansfield ("Mansfield") saw them as well. They were strategically located in the one area where there are no surveillance cameras. Another time, Mansfield told Souther she saw Jose rubbing up against the backside of Lopez. Clearly, the fact that the District

Manager and the Human Resources representative were present in the building was not a deterrent for inappropriate workplace behavior. Upon information and belief, the Kitchen Staff feels "untouchable" because Monisinos protects them.

### Monisinos Attempts to Terminate Souther in Retaliation
### for Making Lawful Workplace Complaints

61.     Monisinos and Sparks were at the restaurant to speak to Souther. They told Souther she was suspended pending an investigation. Ordinarily, any suspension in Johnson's restaurant would involve her. Immediately after Souther was suspended, she contacted Johnson to understand what happened. Johnson had no idea that the waitresses had even quit, let alone that Souther was being suspended. Johnson spoke to Monisinos on Souther's behalf. Johnson told Monisinos that Souther was one of her most dependable and her hardest working employees. Johnson said "Amber has a different work ethic. Besides, it is not Amber's message it is her delivery. She is short with them." Johnson argued that Souther should not be suspended – they should just encourage her to change her tone. Monisinos told Johnson it was done and "my hands are tied."

62.     On September 10, 2019, when Johnson was not at the restaurant, Monisinos and Sparks showed up to terminate Souther. Sparks had called Souther and asked her to return to work and that she and Monisinos would be there. When Johnson found out they were there, curious about what they were planning to do with Souther, Johnson texted Monisinos "I heard you were at Seabrook." Monisinos did not respond to her text message. Monisinos then sent Johnson a text message with Souther's hours informing her that he was letting Souther go. When Souther arrived, Monisinos and Sparks sat her down and told her that they had her final papers and that she was being terminated for "being a bully." In her defense, Souther said: "If I ask someone to please change the coffee filter 15 times, on the 16th time I'm not nice about it."

Souther then spoke directly to Sparks stating, "Maybe I am the one who needs to get a lawyer. I'm being bullied." Souther continued "Did he ever tell you about Oliver having inappropriate relationships with employees, and he was touching a 17-year-old hostess and made her feel uncomfortable - who was crying about Oliver. He was supposed to!" Sparks responded, "No, he didn't." Souther then said, "Isn't it supposed to be that Jess goes to Charlie and Charlie goes to you? Aren't you the next in line?" Sparks responded, "Yes, it is" and then looked at Monisinos. Souther then said, "Well, that's not how it is" and left. Souther was never terminated. When Sparks reported this incident to Wren, Wren still wanted to terminate Souther. However, the third-party company used for HR investigations advised Sparks that she could not terminate Souther as there seemed to be "a lot more going on here." Sparks called her later and told her, "You still have job. Come back. You still have a job." Souther returned to work on her next scheduled day, but Monisinos made it clear she was not allowed to PIC anymore.

**Johnson Reports Kitchen Staff Misconduct to Sparks (Human Resources)
and the Kitchen Staff's Retaliatory Actions that Followed**

63.     The next day, on September 11, 2019, when Johnson returned to work from her days off (she had Tuesday-Wednesday off), Souther complained to Johnson asking why she got suspended when "Oliver can do whatever he wants, including sexually harassing [the 17-year-old hostess] and nothing happens, they don't investigate it at all." Johnson, remembering that Monisinos did not investigate the 17-year old's report or follow-up on her written complaint, called Sparks and asked why no one ever investigated that incident. Sparks told Johnson that she did not know about it and if she had she would have investigated it. Later, when Johnson checked her sent folder to pull up the written complaint, she noticed that her e-mail was deleted mysteriously, and her trash folder was also emptied. She checked the 17-year-old employee's personnel file and the written complaint had been removed from there as well.

64.     Later that day, Johnson and Sparks had a meeting with Monisinos regarding Perez's inappropriate sexual behavior with the female kitchen employees, the 17-year old's written report for sexual harassment, and the inappropriate name calling by the Kitchen Staff. In the meeting Monisinos initially claimed he never received the videos of Perez kissing the buttocks of the 17-year-old kitchen employee or him pushing apart her legs as she sat on the prep-counter. Then Johnson pulled out her iPhone and showed him that the video was contained in their text messages before Monisinos admitted he had seen them. Johnson offered to send the videos to Sparks. Monisinos said he would send them. Sparks later told Johnson that she had to ask Monisinos three times for the videos before he finally gave them to her. In fact, Sparks confronted Monisinos telling him: "You have to tell me the truth. You have to tell me." Further, upon information and belief, iHOP never disciplined Monisinos for not reporting these videos to HR or otherwise investigate further. Sparks questioned this practice saying to Wren: "You can't know things and not investigate. There should be some consequence."

65.     On September 12, 2019, Sparks called Johnson and told her that Perez was going to be suspended pending an investigation.

66.     On September 13, 2019, Perez was working at the restaurant. Johnson was confused because of what Sparks had informed her the prior day. Sparks came into the restaurant. Johnson asked Sparks why he was there – and that she thought he was supposed to be suspended pending an investigation. Sparks told her "Everything is fine. He is not being suspended. This is out of my hands." Later, in Johnson's office, Sparks told Johnson, "I know this is unprofessional … but holy shit!" Sparks confessed to Johnson that iHOP uses a third-party company to conduct investigations and provide a recommendation as to whether an employee should be terminated. Sparks told Johnson that the third-party company recommended that Perez

be terminated and when she told her boss (Wren, Executive Director of Human Resources ),

Wren told Sparks to thank them and instruct them to delete the report from the system because

they were going in "a different direction." In fact, when Sparks told Wren the third-party

company's recommendation, Wren simply asked her "Well, how old is she?" as if the age of the

female was all that mattered, not that the behavior was strictly against company policy. Then,

Sparks told Johnson that they needed to look through the surveillance video footage and find

more videos of Perez touching the female kitchen employees. Sparks told Johnson they needed

"more current evidence" because Wren did not find that the two videos of Perez inappropriately

touching the 17-year-old or the 17-year-old hostess's written complaint to be current enough.

Johnson told Sparks, "When I have told you before I don't trust the company—this is why!"

Johnson also explained to Sparks that she tried to look for the e-mail she sent to Monisinos

containing the 17-year- old's written complaint of sexual harassment against Perez, but the e-

mail had been mysteriously deleted along with her trash folder. Johnson also took this time to

explain to Sparks all that had been going on at the Seabrook location, including the Kitchen Staff

continuously calling her servers "whore" and "cunt" in Spanish.

      67.     During their investigation, Sparks and Johnson found two videos, one from

September 6, 2019 and another from August 30, 2019, which showed Perez engaging in

inappropriate behavior with female kitchen employees. Specifically, the video from September 6,

2019 showed Lopez grabbing Perez's crotch and Perez seemed completely unphased. The other

video showed them grabbing each other's buttocks. Sparks broke down saying she had no idea

any of this was happening and she would have tried to stop it. She was really upset and felt that

she had no control over the outcome—Johnson had to console her. Sparks continued to confess

that she never knew anything about the sexual harassment reported by the 17-year-old hostess

stating, "Charlie never told us -- I would have done something if we had known." Sparks called

Wren over the phone in Johnson's office and told her about the video footage. Sparks sent the

videos directly to Wren, but she wouldn't let Johnson keep a copy. Johnson overheard Sparks tell

Wren: "I will not be a good witness for us when I get deposed."

68.      Later, when Sparks spoke to Wren about the videos, Wren brushed off Perez's

behavior referring to the video where Lopez grabbed Perez's crotch. Wren told Sparks: "He

didn't do anything." Sparks responded: "Well, he didn't stop it." Again Wren told Sparks she

didn't "have enough evidence."

69.      On September 14, 2019, Perez convened a back of the house meeting in Spanish.

Upon information and belief, this was the first of this type of meeting in the kitchen. Johnson,

who would oversee any staff meetings, had no idea what they were saying because she does not

speak Spanish. Starting immediately after this meeting, the kitchen started taking an unusually

long time to cook even the simplest requests. For instance, they waited 22 minutes for as side of

toast, 20 minutes for crepes, etc. It seemed to Plaintiffs, and other servers that the Kitchen Staff

were engaging in an intentional slow-down and retaliating against them for making complaints

about Perez. As a result of the Kitchen Staff's intentional slow-down, the food came out of the

kitchen late and cold. Additionally, as a result, a full party's meals would not come out of the

kitchen at once so families could not eat at the same time. This resulted in numerous unhappy

guests, many of whom did not tip the servers, and possibly did not return to the restaurant again.

70.      Johnson called Monisinos and Sparks – something needed to be done. Johnson

called Monisinos for assistance with dealing with the Kitchen Staff and the slow-down. Johnson

also texted Monisinos and Sparks to tell them about the slow-down because "this is ridiculous"

and they had to come to the restaurant and handle it.

71.     Later that evening, after Johnson left for the day, Monisinos and Sparks showed up at the restaurant. Monisinos and Sparks told Perez that they had to have a meeting with him to determine what happened. Monisinos acted as Perez's interpreter. When Johnson later discovered that Monisinos interpreted the meeting for Perez, she was shocked. Perez spoke perfect English and she has never had any issue speaking to him. To Johnson, it sounded like Monisinos wanted to coach Perez during the meeting in Spanish because Sparks would not know what they were saying. That way Monisinos could coach his <u>cousin</u> on what to say or not say, or if he said something he shouldn't, Monisinos could correct a statement in his translation. Johnson told Sparks "why did you let Charlie be his interpreter? He speaks perfect English. If he needed a translation, he should have used an app." Sparks told Perez that he was going to be suspended pending an investigation based on the kitchen mutiny. Upon information and belief, the investigation had nothing to do with the Kitchen Staff's inappropriate sexual behavior and only had to do with decreased sales and possible loss of returning guests. Sparks told Johnson that she didn't know what was said between Perez and Monisinos or what happened, but Perez quit during the meeting.

72.     After Perez quit at around 8:30 PM the evening of the September 14, 2019, Monisinos called Johnson to inform her. Monisinos's only concern was "who in the kitchen is staying and who is Oliver taking with him?" In the end, only Perez, his daughter, and Lopez ended up quitting with him.

73.     On Saturday, September 28, 2019, two weeks later, Johnson wanted to have an Appreciation Lunch that she provided once in a while for the staff. Souther, who knew that one of the combos, Niz, really liked chicken fingers made a plate for her. Johnson told the other Kitchen Staff they were free to make up plates for lunch as well because they had ordered a lot

of food and she did not want anyone left out. Suddenly Javier (again, Jose's brother, Perez's other nephew, and believed to be also related to Monisinos) started yelling at Niz in Spanish. Johnson does not know what was said. All Johnson knows is Niz stopped eating and said: "Jessica said it's okay."

### September 29, 2019 Kitchen Staff Walk-Out in Retaliation for Plaintiffs' Reporting Perez and the Kitchen Staff's Inappropriate Conduct

74.      The next day, on Sunday, September 29, 2019, Johnson called Monisinos because she needed to talk to Jose and discuss the previous year's sales and she needed his help because of the language barrier. Monisinos mentioned Perez and told Johnson that she shouldn't have any issues with the Kitchen Staff because only Javier is having an issue. Monisinos told her "Javier blames you and Amber [for Perez, his uncle, quitting]." Johnson told him, "Well, we did nothing wrong—you need to stop that. You need to do something. That was Oliver's issue -- he was inappropriate. This is not our fault. Not mine. Not Amber's."

75.      The early part of the morning shift that day went as planned. Later that morning, Jose called Monisinos and they spoke on the phone for some time. Minutes later, as soon as the morning rush started,[7] it was as if the Kitchen Staff stopped working. The Kitchen Staff started only making half of every table's order. The Kitchen Staff stacked the food on top of each other so that the food was not servable because there were sanitary and cross-contamination issues. For instance, cheese from omelets were stuck on the bottom of another plate which was stacked on top of it. The servers, including Souther and Cook, asked the Kitchen Staff what was going on with their orders. Souther spoke up to Jose and told him that they can't have half their orders in or wait 45 minutes for a piece of toast and they can't serve food if they are stacked all on top of

---

[7]      The Sunday morning rush predictably starts at around 11:00 AM and ends at around 2:00 PM.

each other. The restaurant has two kitchens and because the kitchen employees don't want to clean both they usually only use the counter from the second kitchen and put the heat lamps on in order to have more room to spread out the orders. That day, they did not do this and instead just stacked the orders on top of each other. Food was actually flying off the counter.

76.     Whenever Souther, Cook and the rest of the American female servers came near the kitchen the Kitchen Staff called them "puta loco," "puta," and "coño" – "crazy whore," "whore" and "cunt" in Spanish. While this was a frequent occurrence, this time it was louder and more constant. Additionally, every time Johnson came near the kitchen, they began calling her those names as well. The Kitchen Staff also laughed in her face when she spoke to them about the poor condition in which they were sending out the food.

77.     Johnson came over and spoke to Jose and asked, "why are we waiting 15 minutes you need to do your job, Jose." Jose responded that he was working on the pancakes. Johnson told Jose that he's the "kitchen manager – do your job." Souther also asked them what was going on with the kitchen. Souther also told them that they can't stack the plates because it was a sanitary code violation. Jose started yelling at Souther and flashed his middle finger at her. Souther asked Johnson if she could take a video with her phone because she felt that management would never believe her. Souther told Jose she was going to "get a video of this" and proceeded to film and take photographs of the dishes stacked up and Jose giving her the middle finger. Souther said "I have you on video" so he gave her his other middle finger.

78.     Johnson called Monisinos and had to leave him a message. She told him that the servers don't want to work today because they are sick of being called "whore and cunt." Johnson also said: "you need to find me servers I can't do it myself." Monisinos knew Johnson

had surgery scheduled and her family was coming after work to visit her.[8]

79.     Next, the Kitchen Staff walked out of the restaurant and waited in the parking lot seemingly in protest. Without a kitchen, Johnson had no choice but to close the restaurant. Johnson directed the servers to tell customers that a "pipe burst so they had no hot water." One of the other servers admitted the "kitchen walked out." Johnson had to also dismiss the "jam packed" lobby of customers waiting to be seated and "comp checks" for customers who did not get their food.

80.     Johnson called Monisinos to get in touch with him after the kitchen walked out. Johnson left a message and told him she had to shut down the restaurant without a kitchen and that he needed to "figure this out." Souther also sent Monisinos the video of Jose giving her the middle finger which also showed the improperly stacked plates.

81.     When Monisinos called Johnson back she told him: "I have no kitchen. I don't know what Javier's problem is -- Jose only acts like this when Javier is there." Monisinos replied, as if this was a valid excuse, "Oh this is about Oliver- Javier wanted to quit when Oliver quit." Johnson told him: "This isn't our fault. This is retaliation."

82.     At noon that day, Monisinos finally arrived at the restaurant as Johnson and the white female servers were closing the restaurant following the walk-out. Monisinos went over to one server, Mansfield (a PIC) and one other server, and asked them if they would stay, and they agreed. Monisinos then walked over to Johnson, Souther, Cook and another serve Darcy Donahue ("Donahue") (who is Souther's cousin and also made complaints about the Kitchen Staff's inappropriate workplace behavior) and snapped, "You have time to take a video but not to

---

[8]     At that time, Johnson was not sure when she would be out for surgery, but it was originally supposed to the be the following week. The surgery was postponed until November 15, 2019.

serve customers!" Souther responded: "Can't take care of guests if I have no food." Johnson told Monisinos "This is not my fault and this is not Amber's fault." Monisinos dismissed Johnson and the rest of the white female servers, including Cook and Souther. Then Monisinos went back to the parking lot for about 15 minutes and the Kitchen Staff filed back into the kitchen to continue working as if nothing happened. Upon information. As Johnson, Souther, Cook, and Donahue left the restaurant through the back door, and the Kitchen Staff filed back in, Hererra turned to the women and curtly and smugly told them "Adios." As Johnson was leaving, she turned to Monisinos and said in disbelief: "You're totally friggin wrong they walked back in and you don't say anything to them." It felt to Plaintiffs that they were being punished and the Kitchen Staff were being rewarded. Upon information and belief, the Kitchen Staff was never reprimanded for walking out of the restaurant. The servers lost tip money and were told to leave while the Latino Kitchen Staff were allowed to return to work.

83.     Later on September 29, 2019, when Johnson arrived at her home after she left the restaurant frustrated with the treatment, Johnson decided she needed advice on how to handle the situation. She called Kevin Marks ("Marks") who worked as the franchise business consultant for the Northeast region. First, she let him know that she would be out for a month to recover from surgery and asked him to not inspect her restaurant until she returns. Next, she told him, "I'm sorry to bother you. I don't know what to do. My store is on fire. I have no words for it." He told her, "You need to do what you need to do. I don't want you to leave. You do the right thing. Your inspection is great, you're up in sales. I would hate the company to lose you because of this." Johnson responded, "Charlie [Monisinos] is pissed at me. I don't know what to do." Marks asked her if she has "reached out to Jennifer Sparks." Johnson responded, "Yes. If you reach out to your boss and HR what are you supposed to do." Then Marks said, "Do you have

Harold the new VP [COO]'s number? Go a step further, go above the manager." Johnson asked him if it was "even worth it? Either Sal (former COO) covered it up or he's their scapegoat. Charlie told Sal, and now Sal's out and Charlie is still there." Marks told her, "No one can fix a problem they don't know exists. You have to give him the benefit of the doubt. I have a different reaction with Harold."

84.    After she got off the phone with Marks, Johnson called Ceron and left a voicemail saying that she needed to talk about what had been going on lately at Seabrook including the Kitchen Staff walk-out and the inappropriate name calling. Johnson saw that Ceron called her back but did not leave a voice mail and he did not answer when she returned the call. She never heard from him.

85.    Johnson texted Marks to update him: "Thank you for listening to me. I called him twice. No response" Marks responded: "That is disappointing to say the least."

86.    That night, Johnson called Sparks and told her everything that happened with respect to the Kitchen Staff's walk-out. Johnson asked Sparks to come to the restaurant the next day so that she, Cook, Souther, and Donahue could speak to her.

**Following the Walk-Out, iHOP Continues to Condone and Reward the Kitchen Staff's Inappropriate Behavior at Plaintiffs' and the other American Servers' Expense**

87.    The next day, on September 30, 2019, Plaintiffs and Donahue waited all day to meet with Sparks. Ordinarily, Sparks visited the restaurant at 8:00 AM. Finally, at 3:00 PM, Sparks showed up. Sparks brought Monisinos with her, unbeknownst to Johnson who did not know he would be coming. Johnson, Souther, Cook, Donahue, Sparks and Monisinos sat down at table 15. Sparks asked them "what happened Sunday." Johnson showed Sparks Amber's video of the state of the kitchen before the walkout. Sparks then said: "I don't know if they walked out because you didn't run the food, or you didn't run it because you didn't have it." Amber

responded, "We didn't have it." Johnson then responded, "We had half orders. Jennifer, you have a family do you want to eat piecemeal or all together as a table?" Then Johnson explained how it felt to be called names by all the Kitchen Staff saying, "Jennifer, who do you work for? Maria [Wren]? If you called her a 'cunt' how long would you work for her?" Monisinos respond saying, "I respect women-my daughter, a wife, and mother." Johnson interjected "Then why did you cover up [the 17-year-old kitchen employee with whom Perez had an affair] and [17-year-old Perez sexually harassed]. And where is [her] [written] statement?" Then, turning to Sparks, Johnson asked: "Did he send it to you Jennifer?" Monisinos asked, "Where is it?" Johnson responded, "I sent it to you." Monisinos then started to blame former COO Moralis saying that Moralis didn't take care of the "Oliver situation." Souther responded, "I told you Charlie about Oliver making out with employees since Sal has been gone (on July 3, 2019). You sweep it under the rug." Monisinos kept responding that it was either Perez's fault or Moralis's fault. Johnson had enough and got up saying, "I need to take a minute." Then Monisinos pointed his finger at Souther saying, "Why are you taking videos? Isn't it against policy to take a video of back of house?" Johnson heard his response turned around and said: "When you live by the policies of the handbook, then you can quote the policies of the handbook." Souther then said: "Why did you come in and attack me?" Monisinos responded: "Why did you have time to take a video and not to take care of our guests?" Johnson said, "We, no, she is the only one to take a video. The only one. Whom else are you referring to? Stop it. Own what you did." Souther said, "He [Jose] knew I was taking the video. I told him. I feel attacked." Monisinos responded, "Well, I can't help how you take it." Johnson told him it was "cross-contamination" and that the Kitchen Staff started throwing plates on top of each other. Monisinos then said: "Harold spoke to me 'Get that restaurant open.'" Johnson responded: "I believe *this*." Souther responded, "You're

supposed to help us, and you're supposed to problem solve and you make it worse. You create more problem solving." Then, Johnson ended the meeting by saying "I am just curious why we are having the same meeting we had two weeks ago."

88.     The rest of that day, Johnson avoided entering the kitchen as she was sick of being called "whore" and "cunt" in Spanish.

89.     Upon information and belief, the Kitchen Staff was never written-up or spoken to about their behavior leading up to and including the walkout. Instead, Johnson subsequently learned following the September 28, 2019 walk-out that her restaurant would start to reimburse the Kitchen Staff's gas costs for traveling to and from work. The most if not all the Kitchen Staff lived in Lynn, Massachusetts, and travelled approximately one to 1.5 hours to work each day. (Lynn is approximately 35 miles away from the Seabrook iHOP.) Perez previously drove many of the kitchen employees in a van. Upon information and belief, Monisinos and iHOP used the gas money payment as an additional incentive for the Kitchen Staff to continue working at the restaurant.

90.     In Johnson's experience at iHOP, the only times she saw the restaurant pay someone for their gas cost was when iHOP asked someone to travel from another restaurant location to help for the day. When Johnson challenged Monisinos about this new gas payment policy, he told her to "just pay it." The amounts she paid for gas reimbursement were anywhere from $40-$120 per day. This greatly affected the Seabrook location's numbers, and thus, adversely impacted Johnson's quarterly bonus.

91.     All the misbehavior and related events took their toll on the Complainants. On October 1, 2019, Souther had become so nervous and anxious about going into work she stayed in her car. Souther was able to muster enough courage to enter the building approximately 39

mins later. She was terrified about what she would face inside the building.

92.      On October 2, 2019, when Souther opened at 5:30 AM, Javier, the opening cook

and the rest of the Kitchen Staff who commute together did not show up. The cooks were

supposed to open with her so that they could prepare the food for the restaurant's 6:00 AM

opening. Javier and the rest of the cooks did not arrive until 7:00 AM, one hour after the

restaurant opened and one and one-half hour late. Souther texted both Johnson and Monisinos to

report that the cooks were late. Upon information and belief, there were no repercussions for the

cooks' tardiness. Monisinos never responded to Souther. In fact, Johnson pointed out to

Monisinos the different treatment in comparison with how Donahue was treated weeks earlier by

texting, "I am curious if Javier is going to get written up for coming late? Donahue was written

up for closing an hour early." Monisinos never responded. This also was not the first time the

cooks came in that late and were not punished. The Kitchen Staff routinely received more

favorable treatment than other non-Latino employees in the restaurant. The rules often did not

seem to apply to the Kitchen Staff.

93.      Later on October 2, 2019, Monisinos showed up at the restaurant unannounced

and said he would be there all week. Souther went home sick because she had too much anxiety

with Monisinos being there when Johnson wasn't.

94.      On October 4, 2019, Sparks and Monisinos showed up at the restaurant and told

Johnson she was getting a "verbal warning" which would be recorded in writing for her file. The

"verbal warning" for "an employee recently made allegations against another employee that they

had" "fail[ing] to manage the team appropriate (during a "recent investigation involving

allegations of harassment…include[ing] providing the necessary coaching and disciplinary

action to the alleged harasser Jose and Amber Souther. Additionally, you did not keep things

confidential as you spoke to team members about the investigation," and for submitting a job title and pay increase for Souther. The warning also mentioned that Johnson was previously warned regarding "favoritism" of Souther because she "expressed that you appreciate her work ethic and have publicly backed her up." This was particularly shocking to Johnson as Monisinos and Wren constantly showed "favoritism" to the Kitchen Staff.

95.     Among the ludicrous allegations contained in this write-up, Johnson was also reprimanded for not staying during her "full shift." This was incorrect. When Johnson accepted the job at iHOP, she had arranged her schedule with Monisinos so that she could leave at 3:00 PM instead of 5:00 PM so that she could pick up her son at school-this had been approved. Therefore, Johnson was, in fact, working her "full shift." She was also given a warning for "[t]aking tables as a server." Johnson often took tables to help because they were understaffed-which she frequently reported to Monisinos and he told her they were not understaffed.

96.     Johnson refused to sign the warning. Sparks told Johnson she looked "very defensive." Johnson replied: "I'm busy." Sparks then suggested "We can get Maria [Wren] here." Johnson responded, "I don't want Maria here and Jennifer you know why" referring to Maria telling her to destroy the investigation report on Perez. Sparks then inquired into Spark's surgery saying "Are you on any meds? On any pain meds? You must be uncomfortable." Johnson responded that she was "fine."

97.     Upon information and belief, Johnson's written "verbal warning" was in retaliation for speaking up for herself, Donahue, Cook, and Souther in the meeting they had on September 30, 2019. Sparks only allowed Johnson to read the write-up but refused to let her have a copy of the write-up. Johnson insisted that she had the right to have a copy of any write-up that was in her file. Sparks called Maria to obtain permission to provide Johnson a copy, Wren

refused.

98.     Immediately after the write-up, Johnson left to go to the bank. When Johnson

returned, Sparks approached in private and handed Johnson her rolled up write-up in a very

secretive manner. Sparks told Johnson: "You have to understand, I'm only doing what I'm told."

Upon information and belief, Johnson was written-up in retaliation for reporting legitimate

complaints about Perez and the Kitchen Staff's behavior.

99.     Also, on October 4, 2019, Sparks, who was nearly in tears, spoke to Souther in the

parking lot. Sparks told Souther that she already gave her two weeks' notice because she could

not deal with working there anymore and did not want to continue to be a part of iHOP's

misconduct. Souther had previously told Sparks that her anxiety was increasing and that she was

seeing her psychologist that day – she had called earlier and asked to be fit in for an

appointment. Sparks also told Souther that if she was stressed, Sparks would help her file a

"stress claim" before she left.

100.    Later that afternoon, on October 4, after Souther completed her shift, she went to

her psychologist who recommended that she take four weeks off from work due to anxiety she

was experiencing at work. Souther submitted her request for leave and took off the next four

weeks to recover.

101.    Despite all that had happened, the Kitchen Staff's mistreatment of Donahue,

Cook, Souther, and Johnson continued every day; this included openly calling them "whore,"

and "cunt" in Spanish, as well as slow and incomplete orders.

102.    October 6, 2019, Cook closed on Sunday as PIC and because they were low on

staff, she had to waitress too. PIC's are supposed to wear a dress shirt not the serving uniform.

When Monisinos came into the restaurant, he chastised Cook in a very demeaning manner and

said: "Where is your shirt?" Both Jose and Javier laughed at her and pointed both of their fingers at her. Cook felt embarrassed and was shocked that Jose and Javier were allowed to taunt her so openly in front of Monisinos. However, considering how Monisinos spoke to her, it was almost as if Monisinos encouraged their behavior.

103.    Approximately one week after Sparks quit, around mid-October 2019, Wren and Ceron came into the restaurant to talk. First, they thanked the kitchen for "everything you have done" and praised them for "how hard they work." Johnson was in disbelief. Then they pulled Johnson into one of the empty booths. Wren told Johnson, "Jessica we just want to make sure you are in charge of your store and that you're being effective." Johnson communicated that she struggles to be effective because the kitchen doesn't speak English, they walked out, and "Javier won't speak to me."[9] Wren then told Johnson, referencing to Johnson's verbal warning write-up, "I am a big stickler for confidentiality." Johnson responded: "I am a big stickler for the law."

104.    On October 26, 2019, Cook was working as a PIC. The restaurant was very busy, and Jose started taunting Cook threatening to call Monisinos to report her. Cook called Johnson in tears asking her to help stop this behavior. Johnson called Monisinos and then she came to the restaurant to see what was going on with Jose and Cook. Upon information and belief, Monisinos has not investigated these issues, nor did he discipline Jose. Following this day, Cook started experiencing extreme anxiety when she arrived at work. Cook was worried about what Jose will do or say to her at work, including calling her a "fucking bitch" or a "whore" or "cunt" in Spanish. On days when Jose is not working, Cook felt a great sense of relief.

105.    Souther returned to work from her medical leave on or about October 31, 2019.

---

[9]    Again, Javier harbored animosity toward the Complainants and blamed them for Perez's exit from the restaurant.

106.     Another example of kitchen/Latino favoritism and skirting the law occurred on November 11, 2019. Johnson had been trying for three weeks to obtain Matteo Perez ("Matteo") (Oliver Perez's brother)'s I-9 and documentation, to no avail. Monisinos told Johnson that he would take care of it. Monisinos told her to just add $440 to the total for her reports to signify Matteo's weekly payments and he would take care of the rest. Johnson understood this to mean that Monisinos planned to pay Matteo "under the table." While Johnson was concerned that this was illegal and Matteo's payment would look like a miscellaneous expense on her weekly report, Johnson decided not to question the fact that Matteo would be paid outside of the usual payroll practices going forward because it seemed futile. Every time Johnson brought up any questionable or potentially illegal iHOP practices related to the kitchen employees, Johnson was told that it was not her job and told to stay out of it.

107.     On November 15, 2019, Johnson underwent a planned surgery and would be out for a little over a month to recover. Tammy Banville ("Banville") a PIC from the Nashua restaurant was sent to Seabrook to cover in Johnson's absence. Banville immediately acted as though Johnson was not returning saying that: "Jessica is gone. It is my store. I will make it great again and a place where people want to come." Souther and Cook felt that iHOP was trying to find a reason to terminate Johnson by showing that someone else would do a better job, or that the problem with the restaurant was Johnson and not the Kitchen Staff. It seemed, based on Banville's comments, that iHOP told her as much. Souther and Cook were afraid iHOP planned to retaliate against Johnson for reporting the Kitchen Staff's inappropriate conduct.

108.     While Johnson was out on leave, the toxic atmosphere perpetuated. On November 17, 2019, Souther asked Javier for an update on the marinara sauce her customer ordered. He threw it on the counter at her shouting, "Get it yourself!" She flinched. For a moment, she

thought it may be hot; however, instead of heating it up and putting it on a plate he just put it in the bowl unheated. Souther had to heat it herself. Because Johnson was out recovering from her surgery, Souther told the acting manager Banville. Instead of handling the situation and reprimanding the Kitchen Staff, Banville told Souther to contact her when she needed to pick up food from the kitchen and Banville would get it for her. Souther explained that she needs to be able to get her own food from the kitchen, otherwise it would slow her down and it would affect her tips. In order to explain away the delay in food being served, Souther apologized to one table, which happened to a table full of her friends, by saying she was having difficulty with the Kitchen Staff. Banville reprimanded her saying, "you can't tell the customers your issues. Kitchen issues needs to stay in the kitchen." It seemed like no matter what the Kitchen Staff did to her, Souther was the only one ever reprimanded.

109.    On November 20, 2019, Souther went into the restaurant and said hello to the Kitchen Staff -- no one would even speak to her. Most days when Souther worked, her food orders were prepared up to 20 minutes later than they should be. Souther frequently noticed that other servers' orders that were placed after hers were done long before hers were completed. If Souther asked about her orders, the Kitchen Staff swore at her in Spanish or ignored her. Whenever Souther complained to Monisinos or Banville, she was ignored, or told to have her orders go through Banville. Souther tried to explain to them that it would be significantly inefficient for her to have to constantly ask Banville to grab her food for her. She needed to be able to grab her own orders and to especially make sure they are made correctly for her guests. Souther was frustrated that she was labeled a troublemaker after she had voiced legitimate concerns and that iHOP seemed to constantly protect the Kitchen Staff above her and the other white female servers.

110.     On November 24, 2019, Cook was working as PIC. As the result of a storm the lights went out and the computer system was down. When the power turned on, the computer system including the registers remained down. When the computer system is down, no one can pay for food by credit card. Cook called Banville, who told Cook to call technical support. The number for technical support was on Johnson's desktop of her computer, which Cook could not access. Monisinos never responded to any of Cook's calls or messages. Finally, Cook called Johnson not knowing what else to do. Johnson, who was still out recovering from surgery, came into the restaurant and fixed the computer system. Johnson came into the restaurant particularly because she feared that if Cook closed the restaurant early, especially because customers could not pay for their meals, she would be written-up or terminated. Cook is a single mom who needed her job and Johnson wanted to help her out and save her job.[10] While Johnson was there, she also noticed several of the restaurant's bills were not paid and the food delivery had not been submitted. She ordered the food delivery and paid the invoices. Later, on December 17, 2019, Johnson was written-up for her act of dedication because coming into the restaurant had not been "approved." It is not clear who would approve it because if Monisinos had answered his phone or responded to messages, Johnson would not have had to come in while on leave in the first place. Clearly, no good deed went unpunished when one was a complaining victim of mistreatment at iHOP.

111.     Following Johnson's leave for surgery, she felt her restaurant has been left to shambles. For instance, the iHOP Seabrook failed an important food safety inspection while she

---

[10]     On September 3, 2019, Donahue one of the other servers closed the restaurant an hour early, after a no call no show forcing her to work a double shift and the restaurant did not have any customers for a few hours. Donahue was written-up. Comparatively, on October 4, 2019, as explained in detail above, when all the kitchen employees scheduled to open showed up at 7:00 AM for a 5:30 AM shift (during morning rush), no one was written-up, even though Souther was forced to turn away customers.

was away on medical leave. Johnson has never failed a food-based inspection in her food service career, in fact she received the highest score in the company when Marks performed an internal inspection receiving a 92 out of a possible 100 points. As the restaurant had prior notice of the food safety inspection, which was scheduled in advance, Johnson felt the failure was deliberate. Even though the restaurant knew that the inspectors were coming that day, the stored eggs were warm and they did not have a PIC who was Servsafe certified on the premises.[11] Monisinos frequently visited other restaurants in the region and helped out, especially for something this important—Johnson felt as though Monisinos was purposefully avoiding helping her restaurant to cause problems for her. If the restaurant did poorly, Johnson would not have been eligible to receive her bonus and she could have been terminated. Johnson believes Monisinos retaliated against her for making legitimate complaints about his cousin's inappropriate and sexually harassing behavior in the workplace and continuing to report the Kitchen Staff's inappropriate behavior.

112.    On November 25, 2019, Souther went to an appointment with her psychologist to deal with her continuing anxiety at work. Her psychologist recommended that she take an additional few days off from work to return on November 29, 2019.

113.    On December 19, 2019, Johnson returned to work from her medical leave following her surgery.

114.    On December 28, 2019, Monisinos came to iHOP Seabrook unannounced and terminated Souther. When Souther requested that he provide her a reason for her termination, he

---

[11]    Souther requested that the company pay for her to be certified by Servsafe, and Monisinos refused. However, he Monisinos admitted openly that he took the Servsafe test for several other employees, including Hererra (kitchen staff) and Jose (acting kitchen manager and Perez's nephew, possibly also related to Monisinos).

told her, "I don't know. I wish I knew. I am just relaying the message." When she pressed again, he just told her "allegations" and that he did not know any more information. Johnson, who overheard this, was in disbelief, just moments before in her office, Monisinos told Johnson that the termination was based on an allegations Mansfield made against Souther that she called her a "bitch" over a disagreement over Mansfield not restocking the ice cream for frappes. Johnson challenged Monisinos for being too quick to pull the trigger and not even bothering to investigate the allegations. Monisinos told Johnson that Wren had investigated the allegations. Johnson asked him why they did not investigate Jose's drinking (liquor is forbidden onsite after Souther found it in his locker and reported on multiple occasions. Johnson also asked Monisinos, "Who did they interview? Dawn [Mansfield] and the Kitchen Staff who hate Amber? Because Becky, Darcy, Amber and I were also all right there and no one asked us anything." Johnson told him adamantly that she was "right there" and that Souther never called Mansfield "a bitch," nor did she even say that word. Monisinos suggested that they may have looked at the surveillance tapes and Johnson told him she did not know what difference that would make because there is no audio. She suggested he speak to Cook, Donahue, and Amber about what really happened. Monisinos simply responded that it was "out of my hands. Just doing what I am told." Johnson told him: "Sometimes you have to just do what is right." Monisinos ended the conversation telling Johnson she needed to warn Cook and Donahue not to retaliate against Mansfield for (falsely) reporting allegations that led to Souther's termination.

115.    Upon information and belief, iHOP terminated Souther in retaliation for reporting legitimate complaints and concerns. It is also interesting to emphasize that iHOP continuously allowed and condoned the Latino Kitchen Staff to routinely call Cook, Souther and even Johnson "whore" and "cunt" in Spanish without even the slightest repercussion, but they immediately

terminated Souther for one unfounded allegation of using the word "bitch" without even interviewing witnesses to the event.

116.     Beginning in early January 2020, Johnson's doctor diagnosed her with depression and prescribed her medication to treat it. Further, Johnson's doctor recommended she take time away from iHOP. As a result, from early January 2020 until January 30, 2020, Johnson took intermittent leave from iHOP because of her depression and inability to cope with the mistreatment she had endured at iHOP. On January 30, 2020, Johnson requested FMLA leave because of her depression. On February 21, 2020, Johnson, after a long and difficult decision speaking with her family, friends, and physician, decided that she could not return to work at iHOP and continue to endure such unlawful treatment. Johnson felt that she had no choice but to hand in her resignation – her mental health was too important.

117.     Due to the global pandemic, iHOP placed Cook on furlough beginning in mid-March 2020 due to the restaurant closing. During her time away from iHOP, Cook began to realize how much trauma she had suffered while working at iHOP. Monisinos indicated that Cook and the other furloughed employees would return to work in early June. As soon as Cook found out about her potential return to work at iHOP, she began experiencing nightmares about returning to work. The month before returning to work at iHOP, Cook began experiencing episodes where she woke up at night in a cold sweat with a painful squeezing sensation in her stomach. Monisinos called all the other servers and PICs who were on furlough back to work in early June 2020. Monisinos did not call Cook back to work when he called in the rest of the employees. Cook reached out to Monisinos several times to request her return date. Finally, Monisinos indicated Cook could return to work on June 16, 2020 for a training session. On June 16, 2020, Cook returned to work for a three-hour training session. Although the training session

was not a complete return to her normal routine, Cook experienced what she describes as a panic attack in the parking lot. Cook was terrified about returning to iHOP and worried about what she would experience when she arrived. It took all her energy to go into the program that day. The panicking continued throughout the three-hour training session and when she returned home. Cook was supposed to work her regular schedule that week. Cook could not bring herself to go into work and called in sick by providing doctor's notes.

118.    From mid-June 2020 until mid-July 2020, Cook went to the emergency room three times and underwent testing for stomach ulcers which her physicians believed were as a result of stress. Although Cook desperately needed the money, she made the difficult decision to resign from her position at iHOP on July 21, 2020. Cook's physicians eventually diagnosed her with an ulcer which they believe had been caused by stress. Cook felt that she had no choice but to resign because of the toll the work environment was having on her mental and physical health.

119.    Throughout Plaintiffs' employment at iHOP Seabrook, they reported Perez and the Kitchen Staff's inappropriate and sexually harassing conduct to the former COO Moralis, former GM John, Marks, Ceron, Starks, Wren, and Monisinos; however, no action was ever taken. Perez's and the Kitchen Staff's offensive behavior not only continued but worsened – they became brazen in their disregard for the law and company policy. iHOP allowed Perez's behavior to escalate to the point where he was openly sexually harassing 17-year-old female employees. When Johnson reported this to Monisinos, he again covered it up by never reporting the behavior, not disciplining Perez, and (upon information and belief) deleting the evidence of the written report. Wren (an HR professional) instructed Sparks (another HR professional) to have a third-party destroy the third-party investigation report recommending that Perez be terminated. When Perez finally quit following an inquiry into the Kitchen Staff stacking dishes

on top of each other and slow food service (which affected iHOP's bottom line), iHOP then started insulating all of the Kitchen Staff's retaliatory behavior. iHOP began catering to the Kitchen Staff's every need, including paying for their gas money, never disciplining them for their offensive and abusive language ("whore" and "cunt"), nor for their retaliation against Souther and Cook by slowing down/making them wait for their orders.

120.    Upon information and belief, iHOP including Moralis, Monisinos, Ceron, Wren and Sparks never disciplined Monisinos or the Kitchen Staff for their sexually harassing and retaliatory behavior. The only time iHOP seemed to address any issues was when they thought the company was losing money.

121.    The actions described above are mere examples of Perez and the Kitchen Staff's grossly offensive and illegal behavior. Both Perez and the Kitchen Staff engaged in the type of misconduct described above on a daily basis, such that it permeated the work environment and made Johnson, Cook and Souther and the other female servers feel very uncomfortable to the point of adversely affecting their mental health and emotional well-being. Johnson, Cook, Souther, and other female servers also felt that Monisinos favored Perez and the Kitchen Staff unfairly, and to their detriment.

### COUNT I
### Hostile Work Environment Based on Gender
### Violation of N.H. R.S.A. 354-A:6 & 7 and Violation of
### Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*
### (*Against All Defendants*)

122.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 121 inclusive, with the same force and effect as if hereinafter set forth at length.

123.    Plaintiffs are all female -- members of a protected class.

124.    At all times relevant, Plaintiffs were qualified for their positions and performed

satisfactorily.

125.    The discriminatory treatment perpetrated by the male Kitchen Staff and condoned and/or aided and abetted by Defendants as outlined in detail above and incorporated by reference herein were directed towards Plaintiffs and other female servers, including amongst many other actions, relentless name calling in Spanish ("cunt" and "whore") as well exposure to a sexually charged and hostile work environment by witnessing continuous sexual behavior between Perez and the female kitchen staff. This treatment included, amongst many other actions, relentless sexist commentary, as well as a pervasive hostile work environment. This offending conduct is both objectively and subjectively offensive and was so severe and pervasive that it not only interfered with every aspect of Plaintiffs' jobs, but it actually permeated into every aspect of the work environment.

126.    Defendants subjected Plaintiffs to mistreatment that was part of a pattern and practice of tolerating a sexually charged environment among the male Kitchen Staff as well as witnessing continuous sexual behavior between Perez and the female Kitchen Staff.

127.    Despite Plaintiffs' frequent complaints about these comments and behavior to Monisinos and Human Resources, the harassment based on their gender continued unabated.

128.    At no time following Plaintiffs' multiple attempts to seek resolution of these issues did any of the Defendants take decisive action or institute any meaningful changes to alleviate the hostile work environment and mistreatment Plaintiffs experienced.

129.    iHOP and Defendant Monisinos terminated Souther's employment under the pretext of a false claim by another server Mansfield who claimed Souther called her a "bitch." iHOP failed to conduct any investigation into the allegations including refusing to interview the witnesses to the alleged incident who would have supported Souther's denial of the allegations.

Upon information and belief, other individual Defendants may have been involved in the decision to terminate Souther. This will need to be determined through pre-trial discovery.

130.     The work environment at iHOP became so unbearable for both Johnson and Cook that they could no longer tolerate it, they eventually lost hope that it would ever change, and they felt that they had no choice but to terminate their employment.

131.     The conduct engaged in by Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of Plaintiffs.

132.     As a result of the foregoing, Plaintiffs have in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to their reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

**COUNT II**
**Disparate Treatment Based on Gender**
**Violation of N.H. R.S.A. 354-A:6 & 7 and**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.***
**(*Against All Defendants*)**

133.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 132 inclusive, with the same force and effect as if hereinafter set forth at length.

134.     Plaintiffs are all female -- members of a protected class.

135.     At all times relevant, iHOP treated Plaintiffs differently than male Kitchen Staff (outside their protected class) who were similarly situated to them in all relevant respects.

136.     The discriminatory treatment perpetrated by the male Kitchen Staff and condoned and/or aided and abetted by Defendants as outlined in detail above and incorporated by reference

herein were directed towards Plaintiffs and other female servers. This treatment included, amongst many other actions, relentless name calling in Spanish ("cunt" and "whore") as well exposure to a sexually charged and hostile work environment by witnessing continuous sexual behavior between Perez and the female Kitchen Staff.

137.    Defendants intentionally discriminated against Plaintiffs based on their protected class by disciplining them more harshly than the male Kitchen Staff and subjecting them to other adverse employment actions on several occasions, including, not limited to following the kitchen walkout by not allowing them to return to work. As a result, Cook and Souther lost wages, including tips from the beginning of the slowdown and walk out through the remainder of their shifts. Johnson lost revenue from the restaurant which affects her bonus eligibility. Instead of disciplining the predominately male Kitchen Staff, Defendants allowed the male Kitchen Staff to return to without any repercussion. Defendants frequently gave the predominantly male Kitchen Staff more favorable treatment that the female servers in the restaurant.

138.    Despite Plaintiffs' frequent complaints about these comments and behavior to Monisinos and Human Resources, the mistreatment based on their gender continued unabated.

139.    At no time following Plaintiffs' multiple attempts to seek resolution of these issues did Defendants take decisive action or institute any meaningful changes to alleviate the mistreatment Plaintiffs experienced.

140.    iHOP and Defendant Monisinos terminated Souther's employment under the pretext of a false claim by another server Mansfield who claimed Souther called her a "bitch." iHOP and Defendant Monisinos failed to conduct any investigation into the allegations including refusing to interview the witnesses to the alleged incident who would have supported Souther's denial of the allegations. The conduct for which Souther was discharged was nearly identical, if

not less egregious – only one instance alleged, to that of the Kitchen Staff (inappropriate name

calling), yet iHOP only terminated Souther's employment and the Kitchen Staff remained

employed. Upon information and belief, other individual Defendants may have been involved in

the decision to terminate Souther. This will need to be determined through pre-trial discovery.

141.     The disparate treatment that Johnson and Cook suffered at iHOP became so

unbearable that they could no longer tolerate it, they eventually lost hope that it would ever

change, and they felt that they had no choice but to terminate their employment.

142.     Upon information and belief, Plaintiffs' positions remained open or were

otherwise filled with individuals with similar qualifications.

143.     The conduct engaged in by Defendants, as outlined above, was extreme and

outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights

of Plaintiffs.

144.     As a result of the foregoing, Plaintiffs have in the past, and will in the future,

suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of

professional opportunities and development, harm to their reputation, considerable emotional

distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary

losses, punitive damages, attorneys' fees, and costs.

**COUNT VIII**
**Hostile Work Environment Based on National Origin (American)**
**Violation of N.H. R.S.A. 354-A:6 & 7 and Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e**
**(*Against All Defendants*)**

145.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in

those paragraphs of the complaint marked and designated 1 through 144 inclusive, with the same

force and effect as if hereinafter set forth at length.

146.     Plaintiffs are of American national origin.

147.    At all times relevant, iHOP treated Plaintiffs differently than the Guatemalan and/or Latino Kitchen Staff (outside their protected class) who were similarly situated to them in all relevant respects.

148.    The discriminatory treatment perpetrated by the Guatemalan and/or Latino Kitchen Staff and condoned and/or aided and abetted by Defendants as outlined in detail above and incorporated by reference herein were directed towards Plaintiffs and other female servers. This treatment included, amongst many other actions, relentless name calling in Spanish ("cunt" and "whore") as well exposure to a sexually charged and hostile work environment by witnessing continuous sexual behavior between Perez and the female Kitchen Staff. This treatment included, amongst many other actions, relentless commentary often slung in derogatory Spanish terms, as well as a pervasive hostile work environment. This offending conduct is both objectively and subjectively offensive and was so severe and pervasive that it not only interfered with every aspect of Plaintiffs' jobs, but it actually permeated into every aspect of the work environment.

149.    Defendants intentionally discriminated against Plaintiffs based on their protected class by disciplining them and subjecting them to other adverse employment actions on several occasions, including, not limited to following the kitchen walkout by not allowing them to return to work. As a result, Cook and Souther lost wages, including tips from the beginning of the slowdown and walk out through the remainder of their shifts. Instead of disciplining the Guatemalan and/or Latino Kitchen Staff, iHOP allowed them to return to without any repercussion.

150.    Defendants subjected Plaintiffs to mistreatment that was part of a pattern and practice of tolerating an environment of mistreatment of employees who were American at the

hands of the Kitchen Staff who were Guatemalan or of a Latino ethnic background, as well as witnessing continuous epithets slung in Spanish by the Kitchen Staff at the American employees.

151. Despite Plaintiffs' frequent complaints about these comments and behavior to Monisinos and Human Resources, the harassment based on their national origin continued unabated.

152. At no time following Plaintiffs' multiple attempts to seek resolution of these issues did any of the Defendants take decisive action or institute any meaningful changes to alleviate the hostile work environment and mistreatment Plaintiffs experienced.

153. iHOP and Defendant Monisinos terminated Souther's employment under the pretext of a false claim by another server Mansfield. iHOP failed to conduct any investigation into the allegations including refusing to interview the witnesses to the alleged incident who would have supported Souther's denial of the allegations. Upon information and belief, other individual Defendants may have been involved in the decision to terminate Souther. This will need to be determined through pre-trial discovery.

154. The work environment at iHOP became so unbearable for both Johnson and Cook that they could no longer tolerate it, they eventually lost hope that it would ever change, and they felt that they had no choice but to terminate their employment.

155. Upon information and belief, Plaintiffs' positions remained open or were otherwise filled with individuals with similar qualifications.

156. The conduct engaged in by Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of Plaintiffs.

157. As a result of the foregoing, Plaintiffs have in the past, and will in the future,

suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of

professional opportunities and development, harm to their reputation, considerable emotional

distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary

losses, punitive damages, attorneys' fees, and costs.

**COUNT IV**
**Disparate Treatment Based on National Origin (American)**
**Violation of N.H. R.S.A. 354-A:6 & 7 and Violation of**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e**
(***Against All Defendants***)

158.     Plaintiffs repeat, reiterate, and reallege each and every allegation contained in

those paragraphs of the complaint marked and designated 1 through 157 inclusive, with the same

force and effect as if hereinafter set forth at length.

159.     Plaintiffs are of American national origin.

160.     At all times relevant, Defendants treated Plaintiffs differently than the

Guatemalan and/or Latino Kitchen Staff (outside their protected class) who were similarly

situated to them in all relevant respects.

161.     The discriminatory treatment perpetrated by the Guatemalan and/or Latino

Kitchen Staff and condoned and/or aided and abetted by Defendants as outlined in detail above

and incorporated by reference herein were directed towards Plaintiffs and other white American

servers. This treatment included, amongst many other actions, relentless name calling in Spanish

("cunt" and "whore"), which was directed only to the white American servers.

162.     Defendants intentionally discriminated against Plaintiffs based on their protected

class by disciplining them more harshly than the Guatemalan and/or Latino Kitchen Staff and

subjecting them to other adverse employment actions on several occasions, including, not limited

to following the kitchen walkout by not allowing them to return to work. As a result, Cook and

Souther lost wages, including tips from the beginning of the slowdown and walk out through the

remainder of their shifts. Johnson lost revenue from the restaurant which affects her bonus eligibility. Instead of disciplining the Guatemalan and/or Latino Kitchen Staff, Defendants allowed them to return to without any repercussion. Defendants frequently gave the Guatemalan and/or Latino Kitchen Staff more favorable treatment that the white American servers in the restaurant.

163.    Despite Plaintiffs' frequent complaints about these comments and behavior to Monisinos and Human Resources, the mistreatment based on their national origin continued unabated.

164.    At no time following Plaintiffs' multiple attempts to seek resolution of these issues did Defendants take decisive action or institute any meaningful changes to alleviate the mistreatment Plaintiffs experienced.

165.    iHOP and Defendant Monisinos terminated Souther's employment under the pretext of a false claim by another server Mansfield. iHOP failed to conduct any investigation into the allegations including refusing to interview the witnesses to the alleged incident who would have supported Souther's denial of the allegations. The conduct for which Souther was discharged was nearly identical, if not less egregious – only one instance alleged, to that of the Kitchen Staff (inappropriate name calling), yet and Defendant Monisinos only terminated Souther's employment and the Kitchen Staff remained employed. Upon information and belief, other individual Defendants may have been involved in the decision to terminate Souther. This will need to be determined through pre-trial discovery.

166.    The disparate treatment Johnson and Cook suffered at iHOP became so unbearable that they could no longer tolerate it, they eventually lost hope that it would ever change, and they felt that they had no choice but to terminate their employment.

167.    Upon information and belief, Plaintiffs' positions remained open or were otherwise filled with individuals with similar qualifications.

168.    The conduct engaged in by Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of Plaintiffs.

169.    As a result of the foregoing, Plaintiffs have in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of professional opportunities and development, harm to their reputation, considerable emotional distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary losses, punitive damages, attorneys' fees, and costs.

**COUNT V**
**Retaliation**
**Violation of N.H. R.S.A. 354-A:19 and**
**Title VII of the Civil Rights Act of 1964,42 U.S.C. § 2000e-3(a)**
(*Against All Defendants*)

170.    Plaintiffs repeat, reiterate, and reallege each and every allegation contained in those paragraphs of the complaint marked and designated 1 through 169 inclusive, with the same force and effect as if hereinafter set forth at length.

171.    Plaintiffs engaged in protected activity by complaining internally several times to Perez, Monisinos, Ceron, and Human Resources about the discriminatory treatment perpetrated by the Guatemalan and/or Latino male Kitchen Staff and condoned and/or aided and abetted by Defendants, as outlined in detail above and incorporated by reference herein.

172.    In response to Plaintiffs engaging in protected activity, Defendants subjected Plaintiffs to a variety of adverse employment actions, including continued and increased intensity of harassment, disciplining them, and the company's conducting a clearly biased, inadequate, and incomplete investigation into their claims which resulted in perpetuation of the

misconduct.

173.    Further, Defendants subjected Plaintiffs to further adverse employment action following the kitchen walk-out by not allowing them to return to work. As a result, Cook and Souther lost wages, including tips from the beginning of the slowdown and walk-out through the remainder of their shifts and Johnson lost potential revenue towards her quarterly bonus.

174.    Defendants subjected Souther to the ultimate adverse employment action when iHOP terminated her employment under the pretext of a false claim by another server. iHOP failed to conduct any investigation into the allegations, including refusing to interview the witnesses to the alleged incident who would have supported Souther's denial of the allegations.

175.    Defendants subjected Johnson and Cook to the ultimate adverse employment action when they permitted the work environment at iHOP to perpetuate until it became so unbearable for both Johnson and Cook that they could no longer tolerate it. They eventually lost hope that it would ever change, and they felt that they had no choice but to terminate their employment.

176.    These adverse actions listed above are directly and causally linked to Plaintiffs' engagement in the protected conduct of reporting the Guatemalan and/or Latino male Kitchen Staff's discriminatory mistreatment of them, as well as their related complaints about how poorly their complaints and the overall situation had been handled by the company.

177.    The conduct engaged in by Defendants, as outlined above, was extreme and outrageous, wanton, malicious, oppressive, and in gross and/or reckless indifference to the rights of Plaintiffs.

178.    As a result of the foregoing, Plaintiffs have in the past, and will in the future, suffer harm and damages, including, but not limited to loss of wages and other benefits, loss of

professional opportunities and development, harm to their reputation, considerable emotional

distress, humiliation, stress and anxiety, pain and suffering, other pecuniary and nonpecuniary

losses, punitive damages, attorneys' fees, and costs.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court grant the following relief:

(a)     judgment on Counts I through V;

(b)     lost wages and benefits, emotional distress and other recoverable compensatory
        damages, in an amount to be determined at trial;

(c)     enhanced compensatory damages under state law;

(d)     punitive damages under federal law;

(e)     costs, reasonable attorneys' fees, and interest; and

(g)     such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all claims raised in their Complaint that are so

triable.

Respectfully submitted,

AMBER SOUTHER, JESSICA JOHNSON,
and REBECCA COOK,

By their attorney,

WHITNEY LAW GROUP, LLC,

*/s/ Mark M. Whitney*

_____
Mark M. Whitney, Esq. (SBN # 11892)
11 State Street
Marblehead, MA 01945
Phone (781) 631-4400
mwhitney@whitneylawgroup.com

Dated: January 31, 2021